# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **ILA WOMACK-GREY** | **CIVIL ACTION** |
| **VERSUS** | **NO. 08-3956** |
| **WARDEN, LOUISIANA CORRECTIONAL INSTITUTE FOR WOMEN** | **SECTION "B"(6)** |

## REPORT AND RECOMMENDATION

This matter was referred to the United States Magistrate Judge for the purpose of conducting hearings, including an evidentiary hearing, if necessary, and submission of proposed findings and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C), and as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases. For the reasons set forth below, it is recommended that the instant petition be **DENIED WITH PREJUDICE**.

## I. PROCEDURAL HISTORY

On July 24, 1997, an Orleans Parish grand jury issued an indictment against petitioner, Ila Womack-Grey, and co-defendant, Jesse Lee, charging them with the second degree murder of Peter Weber. On October 16, 1997, the trial court granted a motion to sever the

defendants.  On March 30-31, 1998, petitioner was tried by a twelve-person jury, which found her guilty as charged.  On October 15, 1998, petitioner was sentenced to life imprisonment without the benefit of parole, probation or suspension of sentence.  On May 17, 2000, the Louisiana Fourth Circuit Court of Appeal reversed petitioner's conviction and sentence and remanded the matter for retrial based upon its finding that petitioner was prejudiced by the elicitation and introduction of testimony implicating petitioner in crimes unrelated to the one charged and that the prosecutor's comments on such crimes in rebuttal warranted a mistrial.  *State v. Womack-Grey*, No. 1999-KA-0416, 764 So.2d 108 (La. App. 4 Cir. May 17, 2000).  On December 7, 2001, the Louisiana Supreme Court reversed the state appellate court's decision, reinstated petitioner's conviction and sentence, and remanded the matter to the appellate court for consideration of petitioner's remaining claims, finding that any error arising from the admission of evidence of petitioner's prior bad acts, and the prosecution's reference thereto, was harmless.  *State v. Grey*, No. 2000-K-1507, 805 So.2d 1116 (La. 2001).  On February 6, 2002, the Louisiana Fourth Circuit, in accordance with the state supreme court's remand, addressed and ultimately rejected petitioner's remaining claims and affirmed petitioner's conviction and sentence.  *State v. Womack-Grey*, No. 1999-KA-0416, 809 So.2d 1166 (La. App. 4 Cir. Feb. 6, 2002).  On November 22, 2002, the Louisiana Supreme Court denied petitioner's writ application in connection with the state appellate court's February 6, 2002 adverse opinion, thereby rendering petitioner's conviction

and life sentence final. *State v. Womack-Grey*, No. 2002-K-0695, 829 So.2d 1035 (La. 2002).

Following the conclusion of her direct appeal proceedings, petitioner sought post-conviction relief. Petitioner's efforts in this regard culminated on May 16, 2008, when the Louisiana Supreme Court denied her writ application. *State ex rel. Womack-Grey v. State*, No. 2007-KH-1566, 980 So.2d 701 (La. 2008).

Petitioner filed the instant federal habeas corpus action on or about June 27, 2008, raising the following claims for relief: 1) The trial court lacked jurisdiction because her indictment was returned by an unconstitutionally empaneled grand jury as determined by the Louisiana Supreme Court in *State v. Dilosa*, 848 So.2d 546 (La. 2003);[1] 2) her right to judicial review was violated because the record is missing "critical portions" of her state court proceedings; 3) she received ineffective assistance of counsel;[2] 4) the trial court erred in denying petitioner's motion to suppress, denying petitioner's motion for a mistrial, failing to instruct the jury regarding the elements of the crime "accessory after the fact", and

---

[1]Petitioner, in her supporting memorandum, presents claim 1) as two separate claims. However, as both claims are based upon the argument that her indictment was returned by an unconstitutionally empaneled grand jury, as determined in *Dilosa*, *supra*, said claims have been consolidated by the court.

[2]Claims four, five and six, along with a portion of claim two, as set forth in petitioner's supporting memorandum, all concern counsel's alleged ineffectiveness and, as such, have been consolidated by the court.

denying petitioner's motion for a new trial;[3] 5) the evidence was insufficient to support conviction; and, 6) the cumulation of errors rendered the guilty verdict unreliable. The State, in its response (rec. doc. 11), concedes that the instant action is timely and that petitioner has exhausted her state court remedies. Accordingly, this court shall proceed to address the merits after reviewing the applicable facts and standard of review.

## II. FACTS[4]

On February 21, 1997, Detective Kevin Anderson began to investigate a missing person report filed on February 7th by Helen Spence after the disappearance of her brother, Peter Weber. Detective Anderson went to Weber's last known address, 1636 North Lopez Street, to look for Weber's roommates, petitioner Ila Womack-Grey and Jesse Lee. At the residence, Detective Anderson spoke to a man who identified himself as Keith Larenis. The man advised Detective Anderson that neither Grey nor Lee were present and that he was babysitting Grey's son. Detective Anderson subsequently learned that the man who identified himself as Larenis was, in fact, Jesse Lee.

Detective Anderson then went to see petitioner at her place of employment, The Witch's Closet, a shop in the French Quarter. She told Detective Anderson that she evicted

---

[3]Claim 4), set forth above, represents a consolidation of claims eight, ten, eleven, and twelve, as presented in petitioner's supporting memorandum.

[4]The facts are taken from the Louisiana Fourth Circuit's opinion, *State v. Womack-Grey*, No. 1999-KA-0416, 764 So.2d 108 (La. App. 4 Cir. 2000).

Weber at the end of January because he had been using drugs. She then gave Detective Anderson the name of a manager at Pat O'Brien's bar who might know of Weber's whereabouts. However, no one at Pat O'Brien's had ever heard of the "manager" named by petitioner. Detective Anderson also made a futile search for Weber in local drug rehabilitation facilities; and he contacted Weber's employer, who had not seen Weber for some time and who said that Weber had not collected his last paycheck.

Helen Spence testified that, prior to filing the missing person report, she telephoned her brother's employer and the petitioner, who told Ms. Spence that she evicted Weber after a fight at a bar. Petitioner further stated that she had last seen Weber walking towards a nearby Circle K convenience store. Petitioner said that she would have called a cab for him but that she did not have a telephone then. Petitioner further told Ms. Spence that Weber was a nice guy and that she hoped that no harm had come to him. She also gave Ms. Spence the names of places allegedly frequented by Weber, which Ms. Spence attempted to investigate.

In March of 1997, the victim's brother, Robert Weber, flew to New Orleans to assist in the search. He first met Jesse Lee at the North Lopez Street residence; he then met with petitioner at a coffee shop near The Witch's Closet. Petitioner and Lee told Robert Weber that they had asked Peter to leave after he got into a fight at a bar and then tried to fight with petitioner. They suggested that Peter might be in a rehabilitation center for alcohol or drugs.

Petitioner also gave Robert Weber a list of "gay bars" that Peter allegedly frequented and a list of drug dealers who might know something. Robert Weber had learned from Peter's employer that Peter was working double shifts, so he did not believe that Peter was abusing drugs. He also knew that Peter had a girlfriend in New Jersey and had always dated girls, so he did not believe that Peter was gay. Nevertheless, he investigated the bars, the drug dealers and the rehabilitation centers suggested by petitioner.

On Robert Weber's second visit to the North Lopez Street residence, the petitioner, her son, Thayne Womack, and Jesse Lee were all present. Robert Weber asked for his brother's belongings, and petitioner gave him five audiocassettes and a jacket. She told Robert Weber that Peter had taken his clothing to a thrift store.

A family service worker, Kelly Bentley, testified that she attempted to contact petitioner several times beginning in January of 1997. On some occasions, she left her card in the door or with a young man. When petitioner finally responded to a letter and came for an interview, Ms. Bentley asked her about the young man at the house. Petitioner told her that he was a friend, "Peter." Petitioner further informed Ms. Bentley that Peter had the lights turned on and a phone installed, as these were items of concern to the case worker.

On April 21, 1997, a partially decomposed body was found in a wooded area in St. Bernard Parish. From dental records furnished by Ms. Spence, it was positively identified as the body of Peter Weber.

Dr. Paul McGarry performed an autopsy the morning after the body was discovered. The body had been wrapped in a sheet, which in turn was wrapped in some green carpeting. There was a shirt tied around the victim's neck and a plastic bag over the head. The bruising and broken bones in the neck area indicated that the victim died from strangulation. Due to the decomposition of the body, Dr. McGarry could not determine whether the victim had also incurred superficial knife wounds; however, he stated that there were no deep stab wounds. The decomposition also prevented chemical tests for alcohol or drug use.

Police officers then obtained a warrant and searched the North Lopez Street residence. Under the house, the officers observed what appeared to be a shallow grave. Various items were retrieved from inside and underneath the house and later linked to the victim's body. Analysis of soil samples indicated that the soil found in the soles of the victim's shoes was the same as that found underneath the house. A piece of green carpet taken from the house matched the carpet in which the body was wrapped. The officers also found pieces of cord and two knives under the house. Inside the house, the officers observed a red substance on the wall and a stain on the floor.

Sergeant Gina Holland testified that she was placed in charge of the case for St. Bernard Parish when the body was discovered there. On May 2, 1997, after the body had been identified, she went with Detective Anderson to The Witch's Closet, where they

retrieved petitioner for questioning. After being transported to the St. Bernard detectives' office, petitioner was advised of her *Miranda* rights and made a statement.

In this statement, which was read to the jury, petitioner told the officers that, in January, she, Jesse Lee and Peter Weber were at a bar and that she and Jesse dragged Peter home to keep him out of a fight. Peter was still belligerent when they arrived at the North Lopez Street residence. Jesse said that he would handle the situation and that petitioner and Thayne should leave. In a long and detailed account, petitioner described hiding in the bathroom with Thayne while Peter and Jesse fought; asking Peter about some small zip-lock bags she had seen while Peter was packing his belongings; asking Peter whether he wanted her to call a cab; and various other events. Eventually petitioner and Thayne left the house and did not return until dawn. She noticed various things were disturbed and unusual in the house. She described dark stains, flies, and an unusual smell in the living room which she thought was coming from the rabbit's cage; but she did not discuss the matter with Jesse. When she and Jesse were later evicted, Jesse and a friend named Matthew moved something heavy from underneath the house. Petitioner thought she saw a person's feet in the object and knew that the object was Peter Weber's body.

After making this statement, petitioner was arrested for second-degree murder and taken into custody. The next day, May 3rd, petitioner asked if she could make another statement to correct her first one. In her second statement, which was also read to the jury,

petitioner said that she lied in her May 2nd statement. She now explained that she had seen Jesse hit Peter in the head with a stool, cover his head with a plastic bag and strangle him. She also saw Jesse bury the body under the house, and Jesse made her help move the body after they were evicted. Petitioner stated that she drove a truck bearing the body to St. Bernard Parish, while Jesse directed her to a place to deposit it.

Adele Bridges testified that she took over the child protection case when Kelly Bentley went out on family leave. When Ms. Bridges learned that petitioner had been arrested, she contacted the authorities to find out who was caring for Thayne. She learned that Thayne was staying with Jack Elder, the manager of The Witch's Closet, and his live-in girlfriend, Michelle Reyes. Ms. Bridges interviewed Thayne, primarily asking whether he wanted to live with his father, Patrick Womack, in Salt Lake City. Ms. Bridges also arranged for Thayne to be evaluated by Dr. Valerie Turgeon to see whether therapy was warranted in light of the child's potentially distressing past.

Thayne was accompanied to Dr. Turgeon's office by Jack Elder, but Dr. Turgeon interviewed Thayne alone. Thayne told Dr. Turgeon that Jesse killed his friend and that that was why his mother was in jail. Thayne stated that he did not witness the murder but learned about it from Jack Elder. Thayne further stated that he believed Jesse might have killed Peter, but that his mother would not have. When asked about these statements, Dr. Turgeon opined that it is not unusual for a child to deny that a parent has done something wrong.

Thayne was reluctant to talk about his father and said that he could not recall what his father looked like.

Ms. Bridges, meanwhile, called Patrick Womack in Salt Lake City to notify him of petitioner's arrest; and Mr. Womack requested immediate custody of his son. Mr. Womack and his girlfriend, Donna, did not question Thayne about the murder because they did not want to upset him. After several weeks, they hopefully assumed that Thayne had not seen anything of the killing because he never talked about it. Then one day, after Mr. Womack and Donna bought Thayne a little blue chair, Thayne began telling them about how his chair at home was broken in the fight among Jesse, Peter and his mother. After Thayne gave Mr. Womack and Donna a detailed account of the fight, Mr. Womack contacted authorities in New Orleans. While Mr. Womack was on the telephone with the district attorney's office, Thayne, with Donna's assistance, made a diagram depicting where in the house various events relating to the fight occurred. Mr. Womack then arranged to come to New Orleans with Thayne.

Thayne was seven years old when he testified at his mother's trial; he was six at the time of the murder. Thayne testified that, during the fight, Jesse and his mother were beating on his "babysitter." Thayne testified that he was first in the middle of the living room but that his mother led him to the corner. Thayne saw his mother come from the kitchen with a knife, then heard a man say "No, Ila." Then it was quiet. Thayne demonstrated how the

"babysitter" was positioned on the floor and testified that Jesse and his mother were on their knees over him. Thayne identified the black-handled knife found under the house as the knife his mother had during the fight. Thayne admitted that he might have previously told a lie about what he had seen. He also admitted telling a lie about seeing his father kill animals. He testified that his mother made him tell the lie about his father. Thayne confirmed that the babysitter's name was Peter.

It was stipulated that Frank Haab, an employee of the Whitney Bank, would testify that, on January 6, 1997, someone withdrew twenty dollars from an ATM using Peter Weber's access card. The following day, the 7th, there were two additional twenty-dollar withdrawals, one at 4:24 p.m. and another at 6:45 p.m. Then, beginning at 9:41 p.m. that day, there were eight unsuccessful attempts to take money from the same account at the same location, the Circle K, which is two blocks away from the North Lopez Street residence. Mr. Haab would further testify that a balance of $584.84 remained in Weber's account at the Whitney.

Elizabeth Quigley worked at The Witch's Closet from December of 1996 until April of 1997. She testified that she moved in with petitioner and Jesse Lee in February of 1997; her testimony does not indicate that she ever met Peter Weber. She testified that petitioner stated that she had evicted Weber because he was using drugs around Thayne, and testified

further that all of them-including petitioner-used drugs at the house, though not while Thayne was in the room.

Quigley lived with the petitioner and Lee until they were evicted. She then moved with them to Jack Elder's home, but she only stayed there for about a week. After that, Quigley and Lee told petitioner that they had become romantically involved. At that point, petitioner asked them both to leave; and they moved in with Quigley's former boyfriend, Mack Powell, for about a week, then went to Florida for a vacation. Lee was extradited from a Florida jail on the murder charge. Quigley recalled that Lee admitted to her that he committed the murder, but she testified that she was on drugs at the time and could not remember exactly what he said about it.

Mack Powell testified that Jesse Lee gave him some clothing and other items when he went to the North Lopez Street house to visit Quigley. Powell brought the items to court for Lee's trial, then gave them to Weber's family afterwards. He provided a list of the items at the instant trial.

Powell confirmed that Quigley and Lee stayed with him for a short time after they left the Elders' house. Powell testified that, while helping Quigley and Lee pack their things, he found a letter inside an envelope with Jesse's name on it. After testimony by a handwriting expert and petitioner's estranged husband on the issue, the defense stipulated that petitioner

wrote the letter. Powell gave the letter to the police.  In the letter, which was shown to the jury, petitioner wrote:

> Jesse,
>
> My love, I swore your life before my own to you and the Gods though I knew that it would end this way.  I still believe in you as I swore I would. With you goes the last of the goodness in my heart.  I had so longed that you would be my redemption but you were my damnation.
>
> I shall love you all the days of my life but I have done nothing to warrant this, so I swear before all on my soul that I shall <u>NOT</u> betray you to the police and I ask the same of you even though I realize now you never meant any of it.
>
> Love always,

The defense called Detective Marcel David to testify regarding statements made by Jesse Lee.  Detective David and St. Bernard Sheriff Jack Stephens retrieved Lee from Florida.  Detective David testified that he and Sheriff Stephens identified themselves to Lee, explained the charges, and advised Lee of his constitutional rights.  Lee made no statement at that time; but shortly after he was secured in the rear of the vehicle for the drive back to Louisiana, he began talking to them.  He said he was glad it was all over because he was having trouble sleeping at night.

Lee admitted to the officers that he killed Peter Weber.  He said that there was a fight, which Weber had started.  Lee further told Detective David that when, in the course of the fight, Weber struck petitioner, Lee came to her defense.  However, he became so enraged that he blacked out.  When he came to his senses, Weber was dead and blood was everywhere.

Lee tried to control the blood with the plastic bag.  He and petitioner later buried Weber's body under the house, where it remained until they learned they were being evicted, at which time they moved it to a random location in St. Bernard Parish.  Lee stated that he did not call 911 because he had problems pending and did not want to contact the police.

Jack Elder moved to California prior to petitioner's trial, and both sides stipulated to his unavailability.  At the request of the defense, Elder's testimony from Lee's trial was read to the jury.  Elder testified that he saw Lee get drunk one night in a bar and become quite hostile.  Elder managed to bring him home, but Lee did not want to go to sleep.  That night Lee told Elder that he had had a lot of vagrants stay with him but that now he was cleaning his house.  He wanted a quiet home for himself, petitioner and Thayne.  He further told Elder that he had "gotten rid of" someone named Red Dragon and also someone named Peter, whom petitioner and Thayne did not like.

## III.  STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") comprehensively overhauled federal habeas corpus legislation, including 28 U.S.C. § 2254. Amended subsections 2254(d)(1) and (2) contain revised standards of review for questions of fact, questions of law, and mixed questions of law and fact.  Provided that the state court adjudicated the claim on the merits, pure questions of law and mixed questions of law and

fact are reviewed under § 2254(d)(1) and questions of fact are reviewed under § 2254(d)(2).
*Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir. 2000).

As to questions of law and mixed questions of law and fact, a federal court must defer
to the state court's decision unless it "was contrary to, or involved an unreasonable
application of, clearly established Federal law, as determined by the Supreme Court of the
United States." 28 U.S.C. § 2254(d)(1). The United States Supreme Court has noted:

> § 2254(d)(1)'s "contrary to" and "unreasonable application" clauses have
> independent meaning. A federal habeas court may issue the writ under the
> "contrary to" clause if the state court applies a rule different from the
> governing law set forth in our cases, or if it decides a case differently than we
> have done on a set of materially indistinguishable facts. The court may grant
> relief under the "unreasonable application" clause if the state court correctly
> identifies the governing legal principle from our decisions but unreasonably
> applies it to the facts of the particular case. The focus of the latter inquiry is
> on whether the state court's application of clearly established federal law is
> objectively unreasonable, and we stressed in *Williams[ v. Taylor*, 529 U.S.
> 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000)] that an unreasonable application
> is different from an incorrect one.

*Bell v. Cone*, 535 U.S. 685, 694, 122 S.Ct. 1843, 1850, 152 L.Ed.2d 914 (2002) (citations
omitted).

As to questions of fact, factual findings are presumed to be correct and a federal court
will give deference to the state court's decision unless it "was based on an unreasonable
determination of the facts in light of the evidence presented in the State court proceeding."
28 U.S.C. § 2254(d)(2); *see also Hill*, 210 F.3d at 485; 28 U.S.C. § 2254(e)(1).

## IV.  ANALYSIS

### A.  Lack of Jurisdiction Based Upon Unconstitutionally Empaneled Grand Jury

Petitioner seeks federal habeas relief based upon the argument that the state trial court lacked jurisdiction to adjudicate her case.  The basis of petitioner's argument is the fact that her indictment was returned by an unconstitutionally empaneled grand jury as determined by the Louisiana Supreme Court in *State v. Dilosa*, 848 So.2d 546 (La. 2003).  Based upon the following, the court finds petitioner's argument to be without merit.

In *Dilosa*, *supra*, the Louisiana Supreme Court determined that La. C. Cr. P. art. 413(C), which set forth the process for selection of grand juries in Orleans Parish at the time an Orleans Parish grand jury indicted petitioner, failed to provide the procedural protections required by the Louisiana Constitution.  *Id.* at 546.  Federal habeas corpus relief, however, may be granted only when a petitioner has suffered a violation of his or her rights under the United States Constitution.  28 U.S.C. § 2254; *Engle v. Isaac*, 456 U.S. 107, 119, 102 S.Ct. 1558, 1567, 71 L.Ed.2d 783 (1982).  Because the constitutional rights addressed in *Dilosa* were state constitutional rights, federal habeas corpus relief is not available to petitioner. *Davis v. Jones*, 2006 WL 1540114 at *2 n.11 (E.D. La. 2006).  As Magistrate Judge Chasez noted in her Report and Recommendation issued in *Varnado v. Cain*, Civil Action 02-1286 c/w 03-753 and 03-754, 2004 WL 2984804 (E.D. La. 2004), "*Dilosa* affords [petitioner] no solace because it is axiomatic that federal habeas relief may be granted only to remedy

violations of the Constitution and laws of the United States; mere violations of state law will not suffice."

### B. Incomplete State Court Record

Petitioner claims that her right to judicial review was violated and she was denied her right to raise "all meritorious issues" given the "abysmal state of the record in this second degree murder case."[5] According to petitioner, her "rights to appeal and judicial review" were violated because she was unable to review a complete trial record for errors.[6]

The Supreme Court has held that an indigent defendant is entitled to a free copy of the trial transcript to have a meaningful appeal. *Hardy v. United States*, 375 U.S. 277, 84 S.Ct. 424, 11 L.Ed.2d 331 (1964). However, the State is not "obligated to automatically supply a complete verbatim transcript," *Moore v. Wainwright*, 633 F.2d 406, 408 (5th Cir.1980), and a State need not waste its funds providing for free those parts of the transcript that are not "germane to consideration of the appeal." *Draper v. State of Washington*, 372 U.S. 487, 495, 83 S.Ct. 774, 779, 9 L.Ed.2d 899 (1963).

Louisiana law complies with these constitutional standards. Appellate review in Louisiana is restricted to questions of law based on defense objections and assignments of

---

[5] Rec. doc. 3, petitioner's supporting memorandum, p. 38.

[6] Rec. doc. 12, petitioner's objections to State's response, p. 5.

error.  *State v. Francis*, 345 So.2d 1120, 1125 (La.) (citing La. Const. Art. 5, § 5(C) (1974) and La. Code Crim. P. art. 841), *cert. denied*, 434 U.S. 891 (1977).  Thus, when the transcript and record contain the portions necessary to address the issues actually raised on appeal, including those portions where objections were made by counsel, the record is constitutionally sufficient for a meaningful appeal.  *Schwander v. Blackburn*, 750 F.2d 494 (5th Cir. 1985).

Petitioner contends that a complete transcript is necessary so that she can look for errors.  However, it is well settled that the State is not "required to furnish complete transcripts so that the defendants . . . may conduct 'fishing expeditions' to seek out possible errors at trial."  *Jackson v. Estelle*, 672 F.2d 505, 506 (5th Cir.1982).  The law also does not require a more complete transcript when a petitioner is completely unable "to indicate one specific error committed during the portions of trial not included in the record."  *Cf. United States v. Renton*, 700 F.2d 154, 159 (5th Cir.1983).

The record in this case was sufficient for the state courts to review petitioner's appellate grounds for relief.  To warrant federal habeas corpus relief on a claim that state court transcripts are unconstitutionally incomplete, a petitioner must support his claims with more than mere unsubstantiated, transparent speculation.  *See Mullen v. Blackburn*, 808 F.2d 1143, 1146 (5th Cir.1987); *United States ex. rel. Hunter v. Follette*, 307 F. Supp. 1023, 1025 (S.D.N.Y.) ("general assertion that omitted portions of the record 'contained most of the ...

trial errors which are reversible,' presents no ground for federal habeas corpus."), *aff'd*, 420

F.2d 779 (2d Cir.1969), *cert. denied*, 397 U.S. 1067, 90 S.Ct. 1506, 25 L.Ed.2d 689 (1970).

Petitioner has not met this burden and as such, is not entitled to relief on this claim.

### C. Ineffective Assistance of Counsel

The seminal Supreme Court decision regarding ineffective assistance of counsel is

*Strickland v. Washington*, 466 U.S. 668, 697, 104 S.Ct. 2052, 2069, 80 L.Ed.2d 674 (1984),

wherein the Court held that in order to prove that counsel was unconstitutionally ineffective,

petitioner must demonstrate that counsel's performance was deficient and that the deficient

performance prejudiced the defense.  If a court finds that petitioner has made an insufficient

showing as to either one of the two prongs of inquiry, it may dispose of the claim without

addressing the other prong.

Under the deficient performance prong of the *Strickland* test, "it is necessary to 'judge

... counsel's challenged conduct on the facts of the particular case, viewed as of the time of

counsel's conduct.'" *Lockhart v. Fretwell*, 506 U.S. 364, 371, 113 S.Ct. 838, 844, 122 L.Ed.

2d 180 (1993), *citing Strickland*, 466 U.S. at 690, 104 S.Ct. at 2066.  To prove prejudice

under the *Strickland* standard, petitioner "must show that there is a reasonable probability

that, but for counsel's unprofessional errors, the result of the proceeding would have been

different."  *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068.

Petitioner contends that his counsel was ineffective for failing to file a motion to quash the indictment based on the fact that the grand jury was unconstitutionally empaneled. However, the Louisiana Supreme Court did not address that issue under state constitutional parameters until the Dilosa case in 2003. Petitioner was charged via grand jury indictment in 1997. There was no basis for counsel to challenge the grand jury selection process at the time petitioner was indicted. Accordingly, petitioner's ineffectiveness claim is without merit.

Petitioner also contends that counsel was ineffective for failing to have DNA testing performed on physical evidence, such as the victim's fingernails, knives found under the house where the victim's body was initially stored, and "reddish brown stained footprints" under the house. According to petitioner, such testing would have shown that contrary to Thayne Womack's testimony, petitioner played no role in murdering the victim, that Jesse Lee was the sole murderer and that petitioner was only guilty of being an "accessory after the fact." For the following reasons, petitioner's argument is without merit.

First, a review of the trial transcript reflects that Thayne Womack never stated that petitioner, his mother, murdered the victim. When asked whether or not he saw his mother stab the victim, Thayne responded, "No."[7] Thus, contrary to petitioner's suggestion, even if testing of the knives reflected that they contained Lee's fingerprints, such evidence would not have impeached Thayne Womack's testimony. Further, as the above recitation of the

---

[7]State rec., vol. 4 of 12, trial transcript at p. 161.

facts reflects, Dr. McGarry testified that the victim suffered no deep stab wounds which resulted in his death, but rather, died from strangulation. In this same vein, Dr. McGarry also testified that by the time the victim's body was discovered in the woods of St. Bernard Parish it had decomposed to such an extent that dental records were required for identification purposes. Accordingly, the recovery of DNA evidence from fingernail testing was not feasible.

Based upon the above, the court finds that petitioner was not prejudiced as a result of any deficiency on the part of counsel in failing to obtain the above-described DNA testing. As such, petitioner is not entitled to habeas relief with respect to the instant claim.

Next, petitioner contends that counsel was ineffective because he failed to conduct an adequate investigation and failed to call witnesses, including petitioner, to testify on behalf of the defense. However, the alleged failure of counsel to call witnesses is not *per se* prejudicial to the point of warranting habeas relief. *See Buckelew v. United States*, 575 F.2d 515, 521 (5th Cir. 1978) ("complaints of uncalled witnesses are not favored, [in federal habeas review] because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have testified are largely speculative"). In *Alexander v. McCotter*, 775 F.2d 595, 602 (5th Cir. 1985), the Fifth Circuit noted that for a petitioner to show prejudice under *Strickland*, he must show that the testimony of the witnesses would have been favorable and that the witnesses would have testified at trial.

Petitioner must show a reasonable probability that the uncalled witnesses would have made a difference in the result. *Alexander*, 775 F.2d at 603. There is a strong presumption that the failure of petitioner's counsel to call witnesses is a strategic choice. *Strickland*, 466 U.S. at 689-90, 104 S.Ct. at 2065-66 (1984).

In this case, not only has petitioner failed to demonstrate what testimony the uncalled witnesses would have offered and that they would have testified, she has failed to set forth the identity of the uncalled witnesses. Clearly, petitioner has failed to satisfy her burden of proof in this regard.

As for petitioner's claim that she was denied her right to testify at trial, "[a] criminal defendant has a constitutional right to testify in his own behalf; it is an aspect of his right to defend himself, a right held in *Rock v. Arkansas*, 483 U.S. 44, 51-53, 107 S.Ct. 2704, 2709-10, 97 L.Ed.2d 37 (1987), to be implicit in the Fifth, Sixth and Fourteenth Amendments." *Underwood v. Clark*, 939 F.2d 473, 475 (7th Cir. 1991) (citations omitted); *see also White v. Cain*, 2006 WL 3703240, *4 (E.D. La. Dec. 11, 2006). A habeas petitioner, however, has the burden of proving that he was denied this constitutional right. As the court explained in *Turcios v. Dretke*, 2005 WL 3263918, *6 (S.D.Tex. Nov. 29, 2005), "a petitioner in a habeas proceeding cannot prevail on such a claim merely by stating to the habeas court that he told his trial attorney that he wished to testify and that his attorney forbade him from taking the witness stand. *Underwood v. Clark,* 939 F.2d 473, 475-76 (7th Cir. 1991)." The *Underwood*

court specifically noted the potential problem posed if a habeas petitioner, arguing that

counsel unconstitutionally denied him his right to testify, is not required to satisfy his burden

of proof.

> There is grave practical difficulty in establishing a mechanism that will protect a criminal defendant's personal right (that is, a right not waivable by counsel) to testify on his own behalf without rendering the criminal process unworkable. It is extremely common for criminal defendants not to testify, and there are good reasons for this, as we have seen. Yet it is simple enough after being convicted for the defendant to say, "My lawyer wouldn't let me testify. Therefore I'm entitled to a new trial." That's what Underwood did. His affidavit, which is the only evidence bearing on the question, states, so far as pertinent here, "I was denied the opportunity to testify at my own trial in that I told my attorney that I wished to testify on my own behalf. My attorney told me I could not testify."

> We agree with the First Circuit's ruling in *Siciliano v. Vose*, 834 F.2d 29, 31 (1st Cir. 1987), that this barebones assertion by a defendant, albeit made under oath, is insufficient to require a hearing or other action on his claim that his right to testify in his own defense was denied him. It just is too facile a tactic to be allowed to succeed. Some greater particularity is necessary-and also we think some substantiation is necessary, such as an affidavit from the lawyer who allegedly forbade his client to testify-to give the claim sufficient credibility to warrant a further investment of judicial resources in determining the truth of the claim.

*Underwood*, 939 F.2d at 475-76.

In the instant matter, there is no evidence to prove petitioner's claim other than her

statement to the effect that she was not allowed to testify. Petitioner has clearly failed to

satisfy her burden of proof in this regard.

As with petitioner's claim that she was not allowed to testify, petitioner's general claim that counsel failed to conduct an adequate investigation, is also unsupported. Petitioner provides nothing but her unsubstantiated statement in this regard. Further, petitioner provides no argument with respect to what would have changed, i.e., how her trial proceedings would have differed, if counsel had conducted an adequate investigation. Again, petitioner has clearly failed to satisfy her burden of proof.

Petitioner also claims that counsel was ineffective due to his failure, on cross-examination, to point out inconsistencies in Thayne Womack's testimony. According to petitioner, had counsel adequately impeached Thayne Womack, she would not have been found guilty of second degree murder.

A review of counsel's cross-examination reflects that he did make jurors aware of inconsistencies in Thayne Womack's version of events. One such inconsistency is reflected in connection with counsel's questioning of Thayne regarding his direct testimony to the effect that he saw his mother with a knife.

> Q. Did you see your mom do anything with the knife that you just told us about?
> A. I don't know.
> Q. Okay. Had you ever seen that knife before?
> A. Yes.
> Q. When was the last time you saw that knife?
> A. When she killed my babysitter.

Q. Okay. Did you see her stab him with that knife?

A. No.[8]

Thayne Womack, based upon the above exchange, provided jurors with three different versions of events, first stating that he did not know if he had seen his mother do anything with the knife, then stating that he saw the knife when he saw his mother kill the babysitter with it, then contradicting himself by stating that he never saw his mother stab the babysitter.

Counsel further impeached Thayne Womack's testimony by virtue of the testimony he elicited from psychologist, Dr. Valerie Turgeon, regarding the report she provided in connection with her evaluation of Thayne Womack. Specifically, jurors were provided with the following via counsel's cross-examination of Dr. Turgeon.

Q. Thayne told you, ... he stated that Jessie killed their friend but he knew his mother would not kill anyone and did not help Jessie kill their friend. That's what Thayne told you, correct?

A. That's correct.

Q. Now, the next sentence begins with: "Thayne said he did not see Jessie kill their friend." Thayne told you that; isn't that true?

A. That's correct.[9]

Based upon the above, it is clear that counsel, contrary to petitioner's assertion, did point out inconsistencies in Thayne Womack's version of events. Accordingly, again,

---

[8]State rec., vol. 4 of 12, trial transcript at p. 161.

[9]State rec., vol. 4 of 12, trial transcript, p. 176.

petitioner has failed to satisfy her burden of proof for the purpose of demonstrating ineffectiveness on the part of counsel.

### D.  Evidentiary Errors on the Part of the Trial Court

Petitioner argues that she is entitled to federal habeas corpus relief based upon the following alleged erroneous evidentiary determinations on the part of the trial court: 1) Denial of petitioner's motion to suppress her statement of May 3, 1997; 2) denial of petitioner's motion for a mistrial based upon the State's introduction of evidence regarding petitioner's drug use; and, 3) denial of petitioner's request that the jury be instructed with regard to the elements of the crime of "accessory after the fact to murder" and denial of her right to a new trial based on newly discovered evidence.

It is well established that federal habeas review is limited to questions of constitutional dimension.  *See generally Jernigan v. Collins*, 980 F.2d 292, 298 (5th Cir. 1992), *cert. denied*, 508 U.S. 978, 113 S.Ct. 2977, 125 L.Ed.2d 675 (1993); *Castillo v. Johnson*, 141 F.3d 218, 222 and 224 (5th Cir.), *cert. denied*, 524 U.S. 979, 119 S.Ct. 28, 141 L.Ed.2d 788 (1998).  In reviewing a state court's evidentiary determinations, such as the ones set forth above, the federal habeas court's role "'is limited to determining whether a trial judge's error is so extreme that it constituted denial of fundamental fairness.'" *Andrade v. McCotter* 805 F.2d 1190, 1193 (5th Cir. 1986), *quoting Mattheson v. King,* 751 F.2d 1432, 1445 (5th Cir.1985).

Petitioner raised these same claims regarding alleged erroneous evidentiary rulings on the part of the trial judge in connection with her direct appeal. In connection with the trial court's refusal to suppress her May 2, 1997 statement, petitioner argued that the statement was "the fruit of an illegal detention." *Womack-Grey*, 764 So.2d at 115. In rejecting petitioner's claim, the Louisiana Fourth Circuit, in its May 17, 2000 opinion, *Womack-Grey*, 764 So.2d at 115-116, first examined applicable state law.

In support of her claim, [petitioner] cites *State v. Fisher,* 97-1133 (La.9/9/98), 720 So.2d 1179. There the defendant was stopped, handcuffed and questioned in a patrol car by an officer who knew him from the neighborhood. The officer was alone when he heard Fisher's statement. The officer based his stop on general rumors in the neighborhood and could not say whether any of his unnamed sources either witnessed the defendant shoot the victim or heard the defendant admit to shooting the victim. This court found that the officer had at least the reasonable suspicion required for an investigatory stop. This court further stated that, when the driver of the car in which Fisher had been a passenger drove off, the reasonable suspicion ripened into probable cause. Finally, this court deferred to the officer's discretion as to the need for handcuffs and thereafter affirmed the conviction. *State v. Fisher,* 96-0004 (La.App. 4 Cir. 4/2/97), 692 So.2d 713.

In reversing Fisher's conviction, the Louisiana Supreme Court, stated:

The outset inquiry on the admissibility issue is whether defendant had been arrested when he allegedly made the statements. If so, the next inquiry is whether the arrest was based on probable cause.... If there was no probable cause to support the arrest, the third inquiry is whether the alleged statements were inadmissible as the fruit of the unlawful arrest. 97-1133 at p. 4, 720 So.2d at 1182.

As to the third inquiry, the Supreme Court held:

Statements given during a period of illegal detention are inadmissible, even though voluntarily given, if they are the product of illegal detention and not the result of an independent act of free will. *Florida v. Royer,* 460 U.S. 491, 501, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983); *Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975).

The fact that the accused would not have made a statement "but for" the illegal arrest does not alone establish a causal link sufficient to require exclusion of the statement. *Brown,* 422 U.S. at 602-03, 95 S.Ct. 2254, 45 L.Ed.2d 416. On the other hand, the fact that an accused may have been properly informed of his constitutional rights and waived them, while relevant, does not alone break the causal link. [*Taylor v. Alabama,* 457 U.S. 687, 690, 102 S.Ct. 2664, 73 L.Ed.2d 314 (1982) ]; *Brown,* 422 U.S. at 601, 603, 95 S.Ct. 2254, 45 L.Ed.2d 416 (holding Miranda warnings are not a "talisman"). Other factors in assessing the link between the illegal arrest and the statements are the existence of intervening circumstances, the "temporal proximity" of the arrest and the statements, and the "purpose and flagrancy of the official misconduct." *Brown,* 422 U.S. at 604, 95 S.Ct. 2254, 45 L.Ed.2d 416. *See also Taylor,* 457 U.S. at 690-91, 102 S.Ct. 2664, 73 L.Ed.2d 314; *Dunaway v. New York,* 442 U.S. 200, 218-19, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979). [Citation omitted.]

Thereafter, the Louisiana Fourth Circuit applied the above-law to the pertinent facts.

In the instant case, it is undisputed that [petitioner] was under arrest when she made the second statement on May 3rd. Thus, we must make the second inquiry and determine whether the arrest of [petitioner] following her first statement on May 2nd was supported by probable cause.

Probable cause to arrest exists when the facts and circumstances, either personally known to the arresting officer or of which he has reasonable and trustworthy information, are sufficient to justify a man of ordinary caution in believing that the person to be arrested has committed a crime. *State v.*

*Thomas,* 349 So.2d 270, 272 (La.1977). The standard for assessing probable cause is an objective standard that must withstand the "detached, neutral scrutiny of a judge." *State v. Flowers,* 441 So.2d 707, 712 (La.1983), *rev'd on other grounds,* 779 F.2d 1115 (5 Cir.1986). The determination of probable cause must take into account the "practical considerations of everyday life on which ... average police officers can be expected to act." *State v. Raheem,* 464 So.2d 293, 296 (La.1985).

According to the motion and trial testimony, Det. Anderson and Sgt. Holland worked together after the victim's body was recovered. Det. Anderson interviewed [petitioner] prior to the discovery of the body, at which time [petitioner] not only failed to report the murder, but also sent the detective on a futile search for the "missing" person. When petitioner made the May 2nd statement, the officers had already discovered the body and classified the death as a homicide. [Petitioner] was brought in for questioning because she was one of the last people who saw the victim alive. In the May 2nd statement, she admitted hearing a violent argument between Lee and the victim prior to the latter's disappearance. That statement, when combined with the misinformation and false leads [petitioner] gave Det. Anderson at the initial interview, suggested to the police that [petitioner] knew of the crime and, more importantly, that she had not wanted it to be discovered.

It is certainly questionable whether the police had probable cause at this point to believe that [petitioner] had actually participated in the homicide. That is, [petitioner's] failure to report the crime may have created a suspicion that she participated in it, but an equally proper inference would have been that she was protecting the fact of the crime and/or the perpetrator from discovery. The State accordingly argues that, even if the officers lacked probable cause to believe that [petitioner] was guilty of second-degree murder, they had probable cause to believe that she was an accessory after the fact under La. R.S. 14:25, which provides:

> An accessory after the fact is any person who, after the commission of a felony, shall harbor, conceal, or aid the offender, knowing or having reasonable ground to believe that he has committed the felony, and with the intent that he may avoid or escape from arrest, trial, conviction or punishment.

In her brief, [petitioner] cites *State v. Jackson,* 344 So.2d 961 (La.1977), in which our supreme court stated that a person cannot be charged as an accessory after the fact simply because he or she fails to report a crime.

*Jackson,* however, may be readily distinguished from the instant case. Here, [petitioner] not only failed to report the homicide, but, when she was first interviewed by the police, she also misled them into believing that the victim was still alive and that his whereabouts could be discovered by contacting an apparently fictitious manager at Pat O'Brien's and/or the local drug rehabilitation centers. Recalling [petitioner's] misinformation, the police were justified in believing that, at a minimum, [petitioner] intended to help the true murderer avoid discovery and arrest.

Even if we assume, out of an abundance of caution, that the officers did not have probable cause to arrest [petitioner] after her first statement, we must still make the third inquiry discussed in *Fisher,* i.e. whether the statement given during a period of illegal detention was inadmissible, even though voluntarily given, because it was the product of illegal detention and not of an independent act of free will. As noted above, a court must first consider whether [petitioner] was advised of and waived her constitutional rights. In addition, a court must also consider the existence of intervening circumstances; the "temporal proximity" of the arrest and the statements; and the "purpose and flagrancy of the official misconduct." *Fisher,* 97-1133 at p. 11, 720 So.2d at 1186. The contested statement indicates that [petitioner] was advised of and waived her constitutional rights. Moreover, the statement was made on the day after the arrest, not immediately after arrest; and it was made at [petitioner's] request.

By contrast, the statement in *Fisher* was oral, and the alleged waiver of rights was undocumented. The contested statements were made in a patrol car immediately after arrest and subsequently upon arrival at the police station. Finally, the officer taking the statement testified that he sought out the defendant based on rumors in the neighborhood but that he failed to notify homicide detectives or to investigate the facts himself for the five months that passed since he learned of the rumors inculpating the defendant.

*Womack-Grey*, 764 So.2d at 116-117 (footnote omitted).

The state appellate court concluded:

Considering [petitioner's] request that she be permitted to correct her prior statement; the time elapsed between the arrest and the statement; and the officers' apparent good faith in investigating the homicide, [petitioner's] statement appears to have been an independent act of free will. For this reason, and because the police had probable cause to arrest her as, at the minimum, an accessory after the fact, we hold that the May 3rd statement was properly admitted.

*Womack-Grey*, 764 So.2d at 117.

With regard to petitioner's claim that the trial court erred in failing to grant a mistrial based upon the admission of evidence regarding petitioner's drug use, the Louisiana Supreme Court rejected said claim, reasoning:

At issue is a single line of testimony provided by Elizabeth Quigley, a co-worker of [petitioner], who had moved into the apartment [petitioner] shared with Jessie Lee on North Lopez Street in New Orleans, in February of 1997, shortly after the victim's murder. According to Quigley, [petitioner] informed her that she had evicted the victim because he had been using drugs around her son. [Petitioner] had made the same statement to the detective investigating the missing persons report placed by the victim's sister which eventually led to discovery of the victim's body and to [petitioner's] arrest. In an apparent attempt to show that the [petitioner] had lied once more about the victim's disappearance, the state asked Quigley whether she had in fact seen any drugs in the apartment. Quigley informed jurors, over defense objection and subsequent motion for a mistrial, that she had used drugs in the apartment with the [petitioner] and Lee while [petitioner's] son remained in his bedroom. The state mentioned Quigley's testimony during its rebuttal argument at the close of the case as it described the tissue of lies [petitioner] had told in the months separating the victim's disappearance and the discovery of his remains.

The majority on the court of appeal panel considering [petitioner's] conviction acknowledged that evidence of [petitioner's] remarks to Quigley about her supposed eviction of the victim for his drug use was relevant and admissible because the statement "was simply another lie that established

[petitioner's] role in concealing the murder." *Womack-Grey,* 99-0416 at 22, 764 So.2d at 121. However, subjecting Quigley's additional testimony about drug use she had observed on the premises to the balancing test of La.C.E. art. 403, the majority concluded that "whatever relevance it had-if any-was substantially outweighed by the danger of unfair prejudice to the [petitioner], who was then revealed to the jury as a drug user and, accordingly, a criminal and an unfit mother." *Id.,* 99-0416 at 23, 764 So.2d at 121. Although it found the evidence constitutionally sufficient to support the jury's verdict, *Womack-Grey,* 99-0416 at 18-19, 764 So.2d at 119, the majority reversed [petitioner's] conviction and sentence because it lacked "the utmost confidence that ... the verdict rendered was not surely unattributable to the wrongful introduction of the testimony." *Id.,* 99-0416 at 24, 764 So.2d at 122.

However, in the second of two statements she gave the police after her arrest, both of which the court read to jurors as they followed with transcripts provided by the state, [petitioner] admitted that at Lee's insistence, and when they were moving from the apartment, she had helped him remove the victim's body from a shallow grave underneath the residence and then borrowed a truck to drive with Lee into St. Bernard Parish where they disposed of the remains. The court of appeal upheld the admissibility of [petitioner's] statements against her challenge that they were the products of an illegal arrest without probable cause. *Womack-Grey,* 99-0416 at 13-15, 764 So.2d at 116-17. Together with evidence that [petitioner] had lied repeatedly to impede the investigation into the missing witness report made by the victim's sister, [petitioner's] statements implicated her as an accessory after the fact to murder because she had aided Lee "knowing or having reasonable ground to believe that he [had] committed the felony, and with the intent that he ... avoid or escape from arrest, trial, conviction or punishment." La.R.S. 14:25.

Respondent's damning admissions in her custodial statement drew her ever closer to the hub of the murder prosecution against her. This evidence, together with the pattern of her misrepresentation to derail the investigation and the eyewitness account of her son describing [petitioner's] participation with Lee in the victim's murder, provided the evidentiary nexus for the jury to decide the question of her guilt or innocence, also taking into account evidence that [petitioner's] son had given his own prior inconsistent statements about his mother's role in the murder. In this context, the brief testimony Quigley provided about

[petitioner's] drug use, which had no discernible connection to the charged crime and thereby lacked the compelling nature of [petitioner's] custodial admissions, did not pose a significant risk of luring jurors into deciding the case on the basis of [petitioner's] general criminal disposition as opposed to evidence relating directly to the charged crime. We therefore conclude that admission of Quigley's testimony, if erroneous, was harmless because the verdict "actually rendered in this trial was surely unattributable to the error." *Sullivan v. Louisiana,* 508 U.S. 275, 279, 113 S.Ct. 2078, 2081, 124 L.Ed.2d 182 (1993).

*Womack-Grey*, 805 So.2d at 1117-1118.

Finally, petitioner claims that the trial court erred in failing to grant her request that the jury be instructed on the elements of the crime, "accessory after the fact" and in failing to grant her a new trial based on newly discovered evidence. Both claims were addressed and rejected by the Louisiana Fourth Circuit in its February 6, 2002 opinion, *Womack-Grey*, 809 So.2d 1166.

Petitioner argues that the court should have provided the requested jury instruction based upon the provisions of La.C.Cr.P. art. 807 which provide, in pertinent part: "A requested special charge shall be given by the court if it does not require qualification, limitation, or explanation, and if it is wholly correct and pertinent." An obvious problem with petitioner's argument is the fact that even if the trial court's refusal to provide the requested charge was violative of La.C.Cr.P. art. 807, it is of no moment

for the purpose of attaining federal habeas corpus relief.[10]  Additionally, as the state

appellate court noted in rejecting the instant claim, because petitioner "was not

charged as an accessory after the fact, there was no error in the trial court's failure to

instruct the jury relative to this separate offense." *Womack-Grey*, 809 So.2d at 1168.

Petitioner also claims that the trial court erred in denying her motion for a new

trial based upon newly discovered evidence.  In an evidentiary hearing conducted by

the trial court in connection with petitioner's motion for a new trial, the following was

ascertained.

> Krissandra Jenkins testified that she was babysitting Thayne Womack
> for Jack Elder and Michelle Reyes after the appellant's arrest.  She further
> testified that Thayne told her that his mother and the babysitter were arguing
> excitably when the other man jumped in and pushed his mother away.
> According to Ms. Jenkins, Thayne told her that his mother screamed "Stop,
> stop," and told Thayne to go into his room.  Ms. Jenkins testified that Thayne
> did not say anything about a knife.  In addition, she admitted that Thayne
> could not have seen any participation by his mother after he went to his room.
> Ms. Jenkins testified that she came forward after reading about the trial in the
> paper, and concern for Thayne's wellbeing.
>
> Camp Morrison testified relative to extensive investigation he did on
> the case prior to trial, to show that the defense used due diligence prior to trial
> but was, nevertheless, unable to find Ms. Jenkins.  Ms. Jenkins's mother
> confirmed that her daughter decided to come forward after reading an account
> of the trial in the newspaper.

*Womack-Grey*, 809 So.2d at 1168.

---

[10]*See* discussion *supra* at p. 26.

The Louisiana Fourth Circuit, in rejecting petitioner's claim that the trial court erred in denying her motion for a new trial, reasoned:

> Ms. Jenkins did not come forward until she learned that Thayne was in the custody of his father. Her testimony was inconsistent with the fact that a knife was found under the house. Ms. Jenkins admitted that Thayne could not see what happened in the living room after he was sent to his room. Even assuming that Thayne told Ms. Jenkins that his mother did not kill the victim, Dr. Turgeon testified at trial that it is not unusual for a child to deny that a parent has done something wrong. Considering the above facts, the trial court did not abuse its great discretion in denying the motion for new trial.

*Womack-Grey*, 809 So.2d at 1168-1169.

"[E]vidence which merely discredits or impeaches a witness' testimony does not justify a new trial." *United States v. Pena*, 949 F.2d 751, 758 (5th Cir. 1991). The main focus of petitioner's motion for a new trial and this claim on habeas review is that the testimony offered in support of the motion for a new trial challenged Thayne Womack's credibility. This is not a proper basis for obtaining a new trial.

Based upon the above, the court finds that the state appellate court's rejection of petitioner's claim that the trial court erred in denying her motion for a new trial, along with the state appellate court's rejection of petitioner's claims that the trial court erred in denying her motion to suppress, in denying her motion for a mistrial, and in denying her request for a jury instruction regarding "accessory after the fact", did not constitute an unreasonable application of clearly established federal law. As such,

petitioner's assertion that she is entitled to habeas corpus relief based upon the trial court's alleged erroneous evidentiary rulings, is without merit.

### E.  Insufficiency of Evidence

Petitioner complains that the evidence presented at trial was insufficient to support her murder conviction because it was based solely on the trial testimony of her son, Thayne, which was inconsistent with his prior statements and, as such, unreliable.

When conducting a post-AEDPA sufficiency of the evidence review, a federal court may grant relief only if it determines that the state court decision rested on an "unreasonable application" of clearly established Federal law, as determined by the Supreme Court, to the facts of the case.  *See* 28 U.S.C. § 2254 (d)(1).  In its analysis of petitioner's insufficiency of evidence claim, the Louisiana Fourth Circuit Court of Appeal first set forth the applicable Supreme Court law, along with corresponding state law, stating:

> In evaluating whether evidence is constitutionally sufficient to support a conviction, an appellate court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt.  *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).  The reviewing court is to consider the record as a whole and not just the evidence most favorable to the prosecution; and, if rational triers of fact could disagree as to the interpretation of the evidence, the rational decision to convict should be upheld.  *State v. Mussall,* 523 So.2d 1305 (La.1988).  Additionally, the reviewing court is not called upon to decide whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence.  *Id.*  The trier of fact's determination of credibility is not to be disturbed on appeal

absent an abuse of discretion. *State v. Cashen,* 544 So.2d 1268 (La.App. 4 Cir.1989). When circumstantial evidence forms the basis of the conviction, such evidence must consist of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. *State v. Shapiro,* 431 So.2d 372 (La.1982). The elements must be proved such that every reasonable hypothesis of innocence is excluded. La. R.S. 15:438. This is not a separate test from *Jackson v. Virginia, supra,* but rather is an evidentiary guideline to facilitate appellate review of whether a rational juror could have found a defendant guilty beyond a reasonable doubt. *State v. Wright,* 445 So.2d 1198 (La.1984). All evidence, direct and circumstantial, must meet the *Jackson* reasonable doubt standard. *State v. Jacobs,* 504 So.2d 817 (La.1987).

*Womack-Grey*, 764 So.2d at 118 (citation omitted).

The Louisiana Fourth Circuit then examined the evidence submitted at trial.

Initially, we note that [petitioner's] various deceptions and outright lies clearly establish her complicity in concealing the murder. She misled both the victim's siblings and investigators. For example, in her first statement to Sgt. Holland, [petitioner] denied knowing about the murder and said she had watched the victim pack his things and had asked if she should call a cab for him. Later in the same statement, [petitioner] said that she realized that the object that Jesse and a friend were removing from underneath her residence was the victim's body. In her second statement, [petitioner] admitted to cutting the clothesline that was tied around the body before it was buried and subsequently to helping Lee dispose of the body in St. Bernard Parish after they were evicted.

However, [petitioner] correctly notes that there is no evidence tending to establish her direct participation in the actual murder except for the testimony of her seven-year-old son. Thayne testified that he saw [petitioner] and Lee kneeling over the victim and beating him, although he saw only "half" of the fight. He saw his mother take a knife from the kitchen and into the living room during the struggle. He identified the black-handled knife found under the house as the one his mother took into the living room. He testified that he then heard a male voice say "No, Ila," after which there was a silence.

During his testimony, Thayne helped diagram the location of these events in the house. Thayne's testimony tended to show that [petitioner] participated in the actual murder and not merely in its concealment. If credible, the testimony of a single witness may establish the elements of a crime beyond a reasonable doubt. *See State v. Allen,* 94-1895, p. 7 (La.App. 4 Cir. 9/15/95), 661 So.2d 1078, 1084, *writs denied,* 95-2557 and 95-2475 (La.2/2/96), 666 So.2d 1087.

*Womack-Grey*, 764 So.2d at 118-119 (footnotes omitted).

Thereafter, the state appellate court reasoned:

We are aware of and sensitive to the problem of assessing a child's ability to tell the truth in court. In Louisiana, the court traditionally examines the child witness and determines whether he or she can distinguish the truth from a lie and whether he or she understands the importance of telling the truth. We note that new methodologies are available to assess a child's competence to testify, such as the Lyon-Saywitz picture test. In this case, Thayne was questioned about his understanding of the importance of telling the truth in the "truth [witness] chair." He admitted that he might have previously told lies about his father and about what he saw on the night of the murder. A trial court's ruling on a witness's competence, including his ability to understand the difference between truth and falsity, should not be disturbed absent an abuse of discretion. *See State v. Cedrington,* 98-253 (La.App. 5 Cir. 12/16/98), 725 So.2d 565, *writ denied,* 99-0190 (La.6/4/99), 743 So.2d 1249. We find no abuse of discretion in the trial court's examination of Thayne and its decision to allow him to testify.

The jury heard Thayne's testimony implicating his mother in the actual murder of the victim; it also heard the testimony of Ms. Bridges and Dr. Turgeon, which included prior inconsistent statements made by Thayne, such as Thayne's statements that he did not see the actual murder. As recounted in our statement of the facts, the parties were able to introduce and explore Thayne's prior inconsistent statements; the potential influence of his father and Jack Elder; and his desire to protect his mother. These topics were further developed during closing arguments. The jury then chose to believe Thayne's trial testimony and, by implication, to disbelieve his statements made to Ms. Bridges and Dr. Turgeon. The jury further chose to believe that Thayne had

not been influenced and/or pressured into testifying as he did at trial; and viewing the totality of the evidence in the light most favorable to the State, it accordingly could have found [petitioner] guilty beyond a reasonable doubt.

*Womack-Grey*, 764 So.2d at 119.

This court finds that the above conclusion does not represent an unreasonable application of the law enunciated in *Jackson*, *supra*, to the facts of this case. Accordingly, petitioner's claim for habeas corpus relief is without merit.

### F. Cumulation of Errors Rendered Guilty Verdict Unreliable

Petitioner asserts that when all of her claims are combined, when one looks at "the totality of circumstances", then it becomes clear that she received an unfair trial and is entitled to habeas corpus relief. However, as reflected above, none of petitioner's claims warrant federal habeas corpus relief and, as such, combining said claims, for the purpose of attaining habeas corpus relief, represents an exercise in futility.

Accordingly;

### RECOMMENDATION

It is hereby **RECOMMENDED** that the application for federal habeas corpus relief filed on behalf of petitioner, Ila Womack-Grey, be **DENIED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within 14 days after

being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  28 U.S.C. §636(b)(1); *Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996)(*en banc*).[11]

New Orleans, Louisiana, this __14th__ day of _____April_____, 2010.

LOUIS MOORE, JR.
United States Magistrate Judge

---

[11]*Douglass* referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. §636(b)(1) was amended to extend that period to fourteen days.